RAND (ATLANTIC GIANT POWDER CO. v.). See Case No. 626.

## Case No. 11,548.

### RAND v. The HERCULES.

[6 Hall, Law J. 21; 1 U. S. Law J. 145.]

District Court, D. Massachusetts. May, 1811.

SEAMEN'S WAGES— CONFISCATION OF CARGO — FREIGHT THE MOTHER OF WAGES.

[1. The fact that the shipowner also owns the cargo, so that there is no contract for freight, does not destroy the connection between freight and wages; and the court may properly con-template the subject as if cargo belonging to other persons had been actually received on board, to be transported for freight.]

[2. Where an American ship, with cargo be-longing to the shipowner, discharged part of her cargo at Naples without interference, aft-er which the ship and cargo were sequestrated by the Neapolitan government, held that, in re-spect to the rights of the seamen to wages, it should be considered that freight had been earned on the part of the cargo thus landed, and the subsequent confiscation thereof did not affect the right to wages.]

[3. Where a ship bound from an American port to ports of the Mediterranean and return was confiscated at Naples, and was after-wards restored to the master on condition of his making a special voyage, held, that the original voyage was broken up, and the sea-men, having entered into a new contract for wages after the confiscation, were bound there-by on the return of the ship to the United States.]

In admiralty.

DAVIS, District Judge. The libellants. mariners on board the ship Hercules, Ed-ward West, master, on a voyage from Salem to Europe and back to Salem, claim wages at the rate expressed in the shipping paper, from 17th July, 1809, to 25th Feb., 1811. There is a second item in the libel, on a contract made at Naples, 4th July, 1810, to proceed to Civita Vecchia and home, at a less rate of wages than is expressed in the original shipping paper, executed at Salem. Stipulation is given by Nathaniel West, own-

er of the ship, to abide the final decree. The wages claimed by the second item are not controverted; but it is contended, that the events and circumstances of the voyage, preclude all claim for wages, for any services of the libellants on board the ship, prior to the last contract. The libellants shipped at Salem, 17th July, 1809, for a voyage to "Europe and the East Indies, or back to Salem." The orders given to the master, 1st Aug., 1809, by West, the owner, directed him to proceed to Cagliari, Palermo or Messina, as he should find most eligible; and having disposed of the cargo, to return to Salem, touching at any of the Spanish ports in the Mediterranean, there to take in freight for the Spanish Main or colonies, if any advantageous offer should occur. The markets designated for the outward cargo are Cagliari, Palermo and Messina, "except," it is added, "it amounts to a certainty you can go to Naples, and sell there for much greater prices, and without the least doubt as to the safety of the property." The cargo, amounting to sixty thousand dollars and upwards, was wholly owned by West, owner of the ship, excepting the captain's adventure, and an adventure by Archer Fairfield, the amount of which does not appear. A supercargo, or "assistant," as he is called in the orders, was on board, and the master was instructed to advise with him, "in every part of the transactions of the voyage." The ship sailed from Salem 2d August, 1809; and after touching at Cagliari, proceeded to Naples, where she arrived 13th Sept., 1809; the master and supercargo having inferred, from information received at Cagliari, that they might go to Naples with safety. The ship was immediately put under quarantine. On the 21st Sept., while under quarantine, the unloading commenced by the master's order, and was continued until the 25th. The goods unladen were taken to the custom-house stores. On the 25th, the master, having heard a report that his ship and cargo were under sequestration, stopped the unloading of the cargo; but the officers of the customs required him to send ashore what was then laden into boats, and urged him to discharge the residue. This the master refused to do, suggesting the necessity of retaining what remained on board as ballast, and as a necessary security for the ship. Orders to complete the unloading of the cargo were frequently repeated, and insisted on as a condition of the master's receiving the pratique, which is understood to be a certificate of conformity to the quarantine regulations. This document was received for the ship, 13th Oct., after the quarantine had continued one month, and for the goods, one month afterwards, Nov. 13th. On the 10th Nov. the whole residue of the cargo was discharged, by peremptory orders from the officers of the customs, which the master could no longer evade. The evidence produced, gives no further account of the property until 4th Jan.,

1810, when the cargo was advertised for sale, and was sold accordingly at public auction on the next day, "on account of the royal treasury." On the 3d Jan. certain officers of the Neapolitan government, entered on board the ship, unhung the rudder, took an inventory of the provisions and furniture, and sealed the hatches, leaving express orders, that they should not be opened without permission from the custom-house. On the 12th March, 1810, was published a decree of Joachim Napoleon, king of the Two Sicilies, confiscating thirty American vessels, of which the Hercules was one, "in conformity to orders given from Paris," 2d Dec., 1809. Such of the cargoes of these vessels as had not been sold, as well as the ships, were directed to be disposed of at public or private sale, as should be judged most conducive to the royal interests: and the proceeds of the sales were ordered to be deposited in bank, to be employed as the king should judge to be convenient.

Notwithstanding these proceedings, the master of the Hercules was not dispossessed of his ship, but the crew lived on board, on the ship's provisions. The confiscated ships were necessarily sold, as suited the views and convenience of the government, and Captain West was in constant expectation of a similar fate. In June, 1810, he made an arrangement with a merchant at Naples (Mr. Broadbent) for assistance in the purchase of the ship at the appraised value, and to perform a voyage with her to Sicily on that gentleman's account. While this project was in train, viz. 16th June, 1810, a written contract was entered into between Captain West and his crew, including the libellants, by which they engaged to remain on board under his orders until he should be deprived of his command, or the ship should commence loading, in consideration of a small daily allowance for their support, and to proceed on whatever voyage should be proposed, at the monthly wages expressed in the contract. Before the contemplated arrangement with Mr. Broadbent was definitively settled, proposals were made to Captain West, by an officer of high rank, to proceed with the ship to Civita Vecchia, and there take in freight for Philadelphia. For this service an offer was made to give him the ship and papers, to repay the expenses of unlading the cargo, and to satisfy Mr. Broadbent relative to the contract. These overtures were readily embraced, and on the 4th July, the contract between the master and crew, on which the second count in the libel is founded, was concluded. It is for a voyage from Naples to Civita Vecchia and thence to the United States, and is signed by all the libellants. The ship sailed for Civita Vecchia soon afterwards with convoy, and arrived there 21st July. The precise object of the voyage was not understood by the master until his arrival at that place. He then found that he was to take Lucien Bona-

parte, with his family and effects, to Philadelphia. On the 8th August, he sailed for Philadelphia with the freight furnished by Lucien Bonaparte, who, with his family and surte, were passengers on board. For this service two thousand dollars were paid in advance, and eight thousand dollars were, by agreement, to be paid on arrival at Philadelphia. Twelve days afterwards, the ship was captured by a British frigate and sent to Malta. The passengers and their property were taken out, but the ship was liberated on paying a proportion of freight pro rata, the amount of which is not stated. On the 10th of November last. the ship sailed from Malta. and arrived at Salem on the 5th of February, having touched at Gibraltar on the way, and there delivered a quantity of cotton, taken in at Malta.

On these facts it is contended for the respondent: 1st. That no freight was earned on the voyage from Salem to Naples, and that therefore the wages for that period are lost. 2d. That the confiscation of the ship dissolved the first contract, and extinguished all claim for wages under it, if no freight was earned. After that event, it is contended, there existed no legal connexion between the mariners and the ship; and that their subsequent relation to the ship depends altogether on the new contracts entered into at Naples, in June and July. 1810.

In this voyage, though not so entirely disastrous as many others from the United States to the same port, there was still a heavy loss. In determining on the operation of these adverse incidents, I am solicitous to form a correct decision, and to place to the account of each the just portion of the misfortune according to principles of law. In the present state of the world, and in the peculiar situation of American commerce, cases not unfrequently occur dissimilar in material circumstances, to any which we find previously decided. We must refer to general principles, and from their application and by cautious analogies from previous determinations. declare' the result; adjusting. by equitable considerations, what positive authority has not decisively settled. In deliberating on cases of this description, the indignant feelings excited by a view of the severe execution of the continental system on our enterprising and unoffending countrymen. ought not, perhaps. in this place. to be fully expressed. I cannot forbear, however, to remark on one feature of the transaction which perplexes the investigation and augments the difficulty of making a correct decision between the parties: I mean the denial of papers or documents illustrating the proceedings against the vessel and cargo, by which, if produced, the nature and grounds of such proceedings would be seen and understood, and their legal operation in regard to collateral questions satisfactorily determined. No such documents are exhibited, excepting a newspaper copy of the decree of 12th March, 1810; and it is testified by reputable witnesses. fellowsufferers with Captain West, that they could not be procured. There might have been left no alternative to the injurious authors of those acts of outrage, but to choose between silence and sophistry. Still. such a departure from the laudable course of civilized nations in proceedings against foreigners and their property, should be reprobated in every region where truth may yet be expressed and justice find an advocate.

This case is clear of all exceptions to the conduct of the seamen. They performed their duty faithfully, adhered to the ship in all the difficulties attending the voyage, and brought her home in safety to the owner. Have the difficulties occurring in the voyage, extinguished their claim, in whole or in part, to the wages promised in the first shipping paper executed at Salem? The general dependence of wages, on the earning of freight. is admitted; but I am not satisfied that freight should not be considered as earned under the circumstances of this voyage. If the ownership of the vessel and cargo had been in different persons, the question of freight could be considered more distinctly and to better advantage; for an actual contract would have existed in such case. Here the respondent must be viewed as owner of both vessel and cargo. The adventures of Fairfield and of the master. are too inconsiderable to make any difference applicable to the points under consideration. no express contract relative to freight exists, but the union of interests which precludes the necessity of such a contract, does not destroy the connexion between freight and wages, and we may properly contemplate the subject as if the ship had actually received goods on board, the property of other persons to be transported on freight, or as if the vessel had been chartered for the voyage specified. In such a view of the transaction we ought to consider the contract for freight to be a reasonable one, and to be made with all due precautions. having regard to the nature of the voyage. and the peculiar perils attending the destination of the ship. Now. it appears, that a voyage to Naples, or to any other place under French control, was not originally contemplated. By orders prepared previously to those under which the ship was ultimately dispatched, the voyage marked out is to Algiers, Tunis, Cagliari, or "some other neutral or privileged port." When the final orders were given, and a voyage to Naples was authorised. it was evidently under great apprehensions. With those views of a voyage to Naples, if the owner of the ship at the time those orders were penned. had shipped no property of his own, but had merely chartered his ship or taken on board property on freight for that destination, it must be presumed. that a prudent regard to his own interest, would have suggested such an adjustment of the contract. as to encounter only the risk of transportation, and would

have left the earnings of his ship dependent on the safety of the property, after her arrival at Naples. If, from tempting offers of high freight, or from any interest in the profits of the adventure, he should be induced, under such circumstances, to make the reception of freight dependent on the safety of the property after its arrival at the place of destination, yet such a contract would not, in my opinion, create a similar dependence of the seamen's wages on the freight, unless it were distinctly stated to them, and the terms of their shipment should have expressed such a condition.

After a deliberate consideration of this contract, and its incidents, it is my opinion, that the claim of the libellants on the outward voyage, is not defeated by the circumstances which have been stated: nor do I conceive it necessary for authorising this conclusion to resort to the guarded contract relative to freight, which I have supposed the nature of the voyage would reasonably impose on the ship owner. The ordinary contract of freight without any special provisions would, I apprehend, secure freight to the owner of this ship, or, at any rate, sufficient for the payment of wages on the outward voyage. In case of a vessel let to freight, and the object of the voyage being defeated by prohibitions, in the country or place to which the vessel is destined, the Consolato del Mare makes the earning of freight dependent on the knowledge of the parties; if both the owner of the ship and of the goods are informed of the existence of impediments, but still are disposed to encounter the risk, the freight is not payable in case the voyage be interrupted. If the owner of the goods be thus informed, but the owner of the ship is ignorant, freight is payable. If the voyage be commenced, and neither the ship owner nor the proprietor of the goods on board, have any knowledge or expectation of impediment from the sovereignty of the country to which the ship is destined, the Consolato decides, that in such case freight is not payable; because, as it is observed, it is not the fault of the merchant that the act of sovereignty intervenes to obstruct the voyage. The course of modern authorities is opposed to the rule of the Consolato in regard to the last supposed instance of vis major defeating the object of the voyage. Morgan v. Insurance Co. of North America, 4 Dall. [4 U. S.] 455, is a case of this description. There, the vessel arrived at Surinam, the place of her destination, and being prohibited from entering, she returned to Philadelphia with the cargo. The court (Tilghman, C. J.) considered the freight as earned, and that the obtaining permission to land the cargo was the business of the consignee. So also in Blight v. Page, cited in 3 Bos. &.P. 295, where the ship was prevented from taking in a cargo of barley at a port in Russia, in consequence of an unexpected prohibition from the Russian government, a sum in damages, was given to the ship owner against the charterer, equivalent to the stipulated freight. The principles which govern those cases, would go far, I think, to produce a correspondent determination in that which is now under consideration. But I do not think it necessary to declare an opinion, as to that part of the cargo of the Hercules, which was landed by constraint. In expressing a conviction, that there was a sufficient quantity unladen free from exceptions as to freight, I had reference to that portion of the cargo which was landed between the 21st and 25th of Sept. In the protest of the master, made at Naples, 11th June, 1810, he states, that he arrived on the 13th Nov., 1809, and was put under quarantine; but that his cargo was freely admitted, and was begun to be discharged on the 21st of that month; that upon the 25th, he was informed, that his ship and cargo were put under sequestration, upon which he refused to discharge any more, but that the officers of the customs obliged him to do it. We may, as to this suit, lay out of the case, all considerations in regard to that portion of the cargo which was discharged by constraint, after the master had received information which excited alarming apprehensions, and confine our views to that part which was discharged voluntarily. The precise amount is not stated, but from the time employed and the nature of the cargo, I consider it warrantable to presume, that it was sufficient to produce freight adequate to the payment of the wages, if freight were earned. In regard to that portion of the cargo (however it may be with the residue), in my opinion, freight must be considered as earned; and if by fire, or any other calamity, those goods thus landed, had been destroyed immediately after their landing, it would not have affected the claim to freight. The ship, under such circumstances, must be considered as munere vehendi functus, and as having performed the service implied in the contract for transportation of the goods. The subsequent misfortunes attending the property after a voluntary landing, by the direction of the person intrusted with it, must attach altogether and exclusively to the owner or underwriter, unless the specialty of the contract should involve the ship owner in a participation of the loss.

In regard to any subsequent wages, we must look to the fate of the ship, and consider the effect of the royal decree of confiscation.

It is contended by the counsel for the libellants, that the subsequent restoration, especially as there had been no sale of the ship, constitutes a resemblance, in legal operation, between this case and cases of capture and recapture, or of temporary detention by embargo which do not defeat a claim for wages, unless there be fault on the part of the mariners according to repeated decisions both in our state and national courts. Though not informed of the grounds of the condemnation, I consider the decree against the ship

as precluding any demand for wages beyond its date, excepting on the new contract, made after that event. The freight supposed to be earned, establishes the claim for wages, at the rate of the original contract on the outward voyage. I award wages to the mariners at the same rate for the interval between the landing of the cargo and the condemnation, in accordance with a reasonable rule adopted by Judge Peters. Adm. Dec. 130. The seamen not having been discharged, and not being at liberty to leave the ship until her condemnation, without consent of the master, are entitled to compensation during that interval; and I consider the wages stipulated in the shipping paper to be, in this case, the proper measure of that compensation. The contract of 4th July, 1810, which was fairly entered into in reasonable conformity to the existing circumstances, must regulate the claim for wages on the homeward voyage. The subsistence and allowance afforded to the mariners between the condemnation and the new contract, are viewed as a satisfaction of their claims during that interval. On these principles and considerations, I decree the following sums, with costs, &c. to the libellants, &c.

NOTE. Mr. Story, for respondent, prayed an appeal, which was allowed. Afterwards in the circuit court, Judge Story, having been of counsel for the respondent, gave no opinion, but affirmed the decree pro forma. And an appeal was claimed to the supreme court of the U. S. and allowed; but it was not prosecuted.